IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARGARET CONNELLY, ) | |
| ) | |
| Plaintiff, ) | No. 19-cv-7894 |
| ) | |
| v. ) | Judge Jeffrey I. Cummings |
| ) | |
| COOK COUNTY ASSESSOR'S OFFICE; ) | |
| and FRITZ KAEGI, individually ) | |
| ) | |
| Defendants. ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Margaret Connelly brings this action against defendants the Cook County Assessor's Office ("CCAO") and Fritz Kaegi based on alleged wrongful termination in violation of her First Amendment Right to Free Speech and Association under 42 U.S.C. §1983. Connelly also brings a *Monell* claim against the CCAO for allegedly having a policy, custom, and practice of terminating employees that engaged in political speech or association in favor of former Cook County Assessor Joseph Berrios.

On September 5, 2023, Connelly filed a motion seeking summary judgment on each of her claims based on her contention that she was terminated from the CCAO in retaliation for her speech and association in favor of Berrios. (Dckt. #112). Defendants simultaneously filed a motion seeking summary judgment in their favor based on their contention that no one in a decision-making role within the Kaegi Administration had any knowledge of Connelly's political speech or association in favor of Berrios at the time she was terminated. (Dckt. #109). For the following reasons, the Court finds that genuine issues of material fact remain as to whether defendants knew of Connelly's political speech and association in favor of Berrios at the time of

1

her termination, and whether Connelly's speech was a motivating factor in defendants' decision to terminate her employment. The Court therefore denies each side's motion for summary judgment.

I.      LEGAL STANDARD

Summary judgment is appropriate when the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of the case." *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024); *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 584 (7th Cir. 2021) (the existence of a factual dispute between the parties will not preclude summary judgment unless it is a genuine dispute as to a material fact); *Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004) (issues of material fact are material if they are outcome determinative).

When the moving party has met that burden, the non-moving party cannot rely on mere conclusions and allegations to concoct factual issues. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Instead, it must "marshal and present the court with the evidence [it] contends will prove [its] case." *Goodman v. Nat. Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). In determining whether a genuine issue of material fact exists, all facts and reasonable inferences must be drawn in the light most favorable to the non-moving party. *King v. Hendricks Cty. Commissioners*, 954 F.3d 981, 984 (7th Cir. 2020). Ultimately, summary judgment is granted only if "no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (cleaned up). Where (as here), cross-motions for summary judgment have been filed, courts "construe all

facts and inferences therefrom in favor of the party against whom the motion under consideration is made." *Calumet River Fleeting, Inc. v. Int'l Union of Operating Engineers, Local 150, AFL-CIO*, 824 F.3d 645, 647 (7th Cir. 2016) (cleaned up).

## II. FACTUAL RECORD

The following facts are undisputed unless otherwise noted. In June 2011, plaintiff Margaret Connelly was hired by the CCAO as an executive assistant to Director Alfonso Sarro. (Defendants' Response to Plaintiff's Statement of Facts ("PSOF Resp."), Dckt. #123, ¶¶2, 3, 6; Plaintiff's Response to Defendants' Statement of Facts ("DSOF Resp."), Dckt. #124, ¶28). Before and after she was hired into the executive assistant position, Connelly volunteered at fundraisers for then Cook County Assessor Joseph Berrios. (PSOF Resp. ¶9). Connelly never saw anyone from the Kaegi Administration at these fundraisers.[1] (DSOF Resp. ¶48; Dckt. #113-1 at 9).

Defendant Kaegi was elected to the position of Cook County Assessor in November 2018, (PSOF Resp. ¶8), and subsequently sworn into office on December 3, 2018. (DSOF Resp. ¶27). Within the Kaegi Administration, Annette Moore served as the Deputy Assessor Chief Administrative Officer and Sarah Garza Resnick served as the Chief of Staff of the CCAO. (*Id.* at ¶¶13–14.) Prior to December 3, 2018, Kaegi spoke with Moore about terminating employees who were political appointees of Berrios. (*Id.* at ¶16). According to defendants, Moore and

---

[1] Connelly denies this fact, but the record is clear that she testified that she never saw anyone from the Kaegi Administration at the fundraising events. (Dckt. #113-1 at 9) ("Q: So when you were volunteering for Berrios between June 2011 and December 2018, did you ever see anyone from the Kaegi administration at these events? A: No."). To refute this Connelly's testimony on this point, defendants points to the testimony of Sarro – who held positions in both the Berrios Administration and the Kaegi Administration – to the effect that *he* saw Connelly at certain fundraising events. (Dckt. #113-3 at 16; PSOF Resp. ¶¶27–28). However, the fact that Sarro saw Connelly at the events does not necessarily mean that *she* saw him at those events. Thus, Sarro's testimony does not refute Connelly's testimony on this point, as defendants assert.

Kaegi's discussion related to the structure of the CCAO and the fact that there were positions in the Berrios Administration that would no longer exist within the organizational structure of the Kaegi Administration. (*Id.*).

At the time that Kaegi was elected, and the time he assumed office, the CCAO was subject to the Shakman Decree, (Dckt. #113-2 at 9), and the agreed orders entered by the federal district court in what is known as the "Shakman Litigation." The Shakman Decree prohibits the discharge of public employees based on political considerations. (*Id.*; *see also Shakman v. Democratic Organization of Cook County*, 481 F.Supp. 1315, 1358 (N.D.Ill. 1979)). The decree's prohibitions, however, are inapplicable to positions which involve "policy-making to such a degree or are so confidential in nature" that political allegiance is a legitimate hiring criterion. (*Shakman*, 481 F.Supp. at 1358; *see also* Dckt. #113-2 at 9). The *Shakman* court issued an implementation order regarding the consent decree, which included an appendix containing a list of approximately 1,200 "exempt" positions. (*Shakman*, 569 F.Supp. 177, 191–203 (N.D.Ill. 1983)).

Between the election and taking office, Kaegi and certain members of his team received a list titled "Berrios Administration Board of Review Transfers/Non-Competitive Hires" (the "List"). (Dckt. #113-9; #113-10). The List named Connelly (referenced therein as "Winters"), along with other individuals. (PSOF Resp. ¶35; Dckt. #113-10). Connelly contends that the List contained the names of individuals that were believed to have been hired at the CCAO because they were politically close to Berrios. (PSOF Resp. ¶35). Connelly further contends that Kaegi directed members of his team to "take note" of the individuals on the List. (*Id.*).

For their part, defendants contend that the List named employees who were hired into positions in the CCAO under the Berrios Administration that did not go through a competitive

4

hiring process. (DSOF Resp. ¶21). Defendants claim that Kaegi directed his staff to take note of who was on the list "so that [he knew] folks who had been noncompetitively hired." (Dckt. #113-2 at 14).

During the transition period between assessors, but prior to the first day of the Kaegi Administration, the CCAO made offers of employment to three executive assistants. (DSOF Resp. ¶18; PSOF Resp. ¶48). At least two of the individuals that were offered employment had less executive assistant experience than that of Connelly. (PSOF Resp. ¶50).

On the first day of the Kaegi Administration, Connelly was served with a notice of termination. (*Id.* at ¶39). Connelly testified that Garza Resnick and Moore met with her and informed her that her services were no longer needed "because of the new administration." (*Id.*). Although Moore and Garza Resnick met with Connelly, Moore testified that all termination decisions ultimately rested with Kaegi as the elected official. (Dckt. #113-6 at 19). Kaegi testified that although Moore and Garza Resnick did not have unilateral authority to eliminate positions in the CCAO, they could eliminate positions "with [his] condoning them – [with them] acting as [his] proxy." (Dckt. #113-2 at 33).

The CCAO maintains an Employment Plan, which sets forth the basic principles and processes by which the CCAO makes employment decisions related to civil service employees and politically appointed employees. (PSOF Resp. ¶14). Section X.H of the Employment Plan provides that:

> an Executive Assistant is not covered by a CBA, is an at-will employee, and may be terminated from employment with the Assessor's Office when the Deputy or Director is separated from employment with the Assessor's Office. Such termination does not give rise to a claim of political discrimination unless the Termination was based on Political Reasons or Factors directed at the Executive Assistant separate and apart from the Deputy or Director.

5

(*Id.* at ¶19). Defendants claim that Connelly was terminated pursuant to Section X.H of the Employment Plan because she was an executive assistant who was hired specifically to assist a certain director (Sarro), and the Kaegi Administration made the decision, as part of reorganizing the CCAO, that only certain deputies were to be given an executive assistant. (DSOF Resp. ¶20).

Kaegi initially testified that Connelly was a Shakman-exempt employee, however, he later shifted course and testified that Connelly's executive assistant position was not Shakman-exempt but was instead treated in a different category from civil service employees by the Employment Plan. (Dckt. #113-2 at 21, 34). Kaegi agreed, however, that Connelly could not be terminated in the manner she was if she held a non-exempt position. (Defendants' Response to Plaintiff's Statement of Additional Facts ("PSAF Resp."), Dckt. #128, ¶30) (citing Dckt. #113-2 at 21)).

On the day of his inauguration – the same day Connelly was terminated – Kaegi made two statements regarding personnel changes in the CCAO. First, Kaegi distributed a memorandum to his staff that stated in relevant part, "I first want to acknowledge that several employees of this office were let go this morning . . . from now on our office will hire based on what someone can do for the people of Cook County, not based on the people they know. To put a fine point on it: family or political connections will no longer be a qualification for employment in this office." (PSAF Resp. ¶21; Dckt. #113-17 at 2). Later, during a speech, Kaegi announced "this morning, we ended the employment of anyone who received his or her job purely due to patronage or nepotism."[2] (PSOF Resp. at ¶61).

---

[2] Defendants argue that Kaegi's statements from "a political stump speech" and an interview "cannot be relied upon by [Connelly] in support of her motion." (Dckt. #121 at 9). In support of their argument, defendants cite to *In re Career Educ. Corp. Sec. Litig.*, No. 03-cv-8884, 2006 WL 999988 (N.D.Ill. Mar. 28, 2006), but that case is not instructive here. In *Career Educ. Corp. Sec. Litig.*, the court reasoned that

6

One month into his administration, on January 3, 2019, in an interview published on WTTW's website, Kaegi stated his administration had "let go of all political appointees who were [in the CCAO] exclusively due to patronage and nepotism . . ." (DSOF Resp. ¶9; PSOF Resp. ¶32; Dckt. #113-19 at 2). Defendants argue that Kaegi's statements refer to individuals who had been appointed in the Berrios Administration in Shakman-exempt roles who might have been hired in a non-civil service process or a non-competitive process. (DSOF Resp. ¶9). Connelly disagrees and asserts that Kaegi's statement was not limited only to Shakman-exempt employees.

Kaegi, Garza Resnick, and Moore all deny that they were aware of Connelly's political speech and affiliation at the time of her termination. (*Id.* at ¶¶35, 44, 52) (citing Dckt. #113-2 at 24, #110-1 at 639, #113-6 at 29)). Yet, when asked about patronage hiring, Moore responded that prior to December 3, 2018, she spoke with the plaintiff's attorney in the Shakman Litigation, who identified Connelly as someone that did not go the employment process for non-political appointments to obtain her position. (Dckt. #113-6 at 9).

### III. DISCUSSION

As discussed above, the parties have cross-moved for summary judgment on Connelly's claims. However, the factual record reveals the existence of genuine disputes of material fact regarding the elements of Connelly's claims that preclude granting summary judgment for either side.

---

plaintiff could not rely on a report of the news program "60 Minutes" and the testimony of a congresswoman to meet the heightened pleading required by the Private Securities Litigation Reform Act, 15 U.S.C. §78u-4. *Id.*, at *6. Here, the statements at issue qualify as the admissions of a party opponent under Federal Rule of Evidence 801(d)(2) because they were made by Kaegi, a defendant who knew of Connelly's termination and had ultimate authority over termination decisions in the Assessor's Office. (Dckt. #113-6 at 19). As such, these statements are admissible evidence that may be considered on the parties' cross-motions for summary judgment.

### A. There is a Genuine Dispute of Material Fact as to Whether Connelly was Fired from the CCAO Due to Her Political Activities.

To establish a *prima facie* case of unlawful First Amendment retaliation, a public employee must show that: (1) she engaged in constitutionally protected speech; (2) she suffered a deprivation likely to deter her from exercising her First Amendment rights; and (3) her speech was a motivating factor in her employer's adverse action. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). If a plaintiff establishes a *prima facie* case, the burden then shifts to her employer to demonstrate that it would have taken the same action in the absence of the plaintiff's protected speech. *Id.* at 717. If the employer meets this burden, the plaintiff may still survive summary judgment by producing sufficient evidence to allow a reasonable fact finder to determine that the employer's reasons were merely a pretext for firing her for exercising her First Amendment rights. *Id.* This means a plaintiff must produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason for her termination is a lie. *Vukadinovich v. Board of School Trustees*, 278 F.3d 693, 699 (7th Cir. 2002).

The first two elements of Connelly's retaliation claim are undisputed for purposes of summary judgment given the parties' agreement that Connelly engaged in activity protected by the First Amendment and that her termination could be a deprivation likely to deter free speech. (Dckt. #121 at 5). The principal dispute in this case surrounds the third element—i.e., whether, and to what degree, Connelly's political speech or association in favor of Berrios motivated defendants' decision to fire her. This third element amounts to a causation inquiry. *Massey*, 457 F.3d at 716 (citing *Roger Whitmore's Auto. Servs., Inc. v. Lake County, Illinois*, 424 F.3d 659, 669–70 (7th Cir. 2005)). To establish a causal link between the protected speech and an adverse action by the employer, the plaintiff must show that the protected conduct was a substantial or

motivating factor in the employer's termination decision. *See Mt. Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. 274, 287 (1977).

### 1. Connelly has offered sufficient evidence to create a genuine dispute as to whether she has established a *prima facie* claim for retaliation.

"To show that [an adverse action] was motivated by [her] protected speech, [a plaintiff] must first demonstrate that the defendants knew of the protected speech." *McGreal v. Village of Orland Park*, 850 F.3d 308, 313 (7th Cir. 2017). In consideration of this element of Connelly's claim, the Court concludes that the record contains sufficient evidence to allow a reasonable jury to find that her First Amendment activity—specifically, her political support and association in favor of Berrios—was a motivating factor in defendants' termination decision.

Defendants claim there is no evidence that anyone with decision-making authority in the Kaegi Administration knew about Connelly's political speech in favor of Berrios. But even if the Court takes as true Kaegi's and Garza Resnick's denials that they were aware that Connelly had volunteered at fundraisers for Berrios, the evidence with respect to Moore's knowledge is equivocal. Again, notwithstanding Moore's denial that she was aware of Connelly's political speech in favor of Berrios, Moore testified when questioned about patronage hiring that she had a conversation with the Shakman plaintiff's attorney prior to the start of the Kaegi Administration during which the attorney told her that Connelly received her position *without* going through the employment process for non-political appointments. (Dckt. #113-6 at 9). When Moore's testimony is viewed in the light most favorable to Connelly (as it must be when considering defendants' motion), the Court finds that a reasonable jury could find that the Kaegi Administration – through Moore – had reason to believe that Connelly was a supporter and political appointee of Berrios at the time it terminated her employment.

9

Furthermore, after the election – but prior to taking office – members of the Kaegi Administration received the List and Kaegi instructed his staff to "take note" of it. Connelly also presents evidence that on the first day of Kaegi's administration (and the same day Connelly was terminated) and shortly thereafter, Kaegi boasted on three occasions that his administration had already ended the employment of *anyone* who received his or her job due to patronage. A reasonable jury could infer that Kaegi intended the word "anyone" to include Connelly.

In sum: viewing this evidence and all reasonable inferences in favor of Connelly, Connelly has raised a genuine dispute of material fact as to whether her political speech in favor of Berrios and her association with him were a substantial or motivating factor behind defendants' decision to terminate her employment on the same date they terminated the other patronage employees who were put in place by Berrios.

### 2. Defendants have presented sufficient evidence to create a genuine dispute as to whether they have rebutted Connelly's retaliation claim.

Because Connelly has established a *prima facie* First Amendment retaliation claim, the Court turns to whether defendants have provided sufficient evidence to, at a minimum, create a genuine dispute as to rebut Connelly's claim by establishing that they would have taken the same actions in the absence of Connelly's protected speech. *See Ashman*, 438 F.3d at 784; *see also Mt. Healthy*, 429 U.S. at 287. The Court finds that defendants provided sufficient evidence to allow a reasonable jury to conclude that they have met their burden. Defendants assert that Connelly was terminated because they made the decision to eliminate all executive assistant positions for CCAO employees below the Deputy level as part of the reorganization of the CCAO under the Kaegi administration. (Dckt. #111 at 9). This is a facially legitimate reason. Defendants also point to evidence that: (1) they were not aware of Connelly's public speech in favor of Berrios, because Connelly never saw anyone from the Kaegi Administration at the

10

fundraisers for Berrios; and (2) the List named employees who were hired into positions in the CCAO under the Berrios Administration that did not go through the competitive hiring process (and was *not* a list of individuals who were politically close to Berrios), and that Kaegi directed his staff to take note of who was on the List "so that [he knew] folks who had been noncompetitively hired."

If this evidence is believed and construed in the light most favorable to defendants (as it must be when considering Connelly's motion), the Court finds that a reasonable jury could find that defendants would have terminated Connelly's employment even in the absence of her protected speech. *See, e.g., Nelms v. Modisett*, 153 F.3d 815, 821 (7th Cir. 1998) (finding that a reorganization by an elected official to be a legitimate nonpolitical reason for the termination of a plaintiff who had less work experience and "unprofessional" work habits than his more experienced counterpart whose work performance was "exemplary").[3]

### 3. Connelly has provided sufficient evidence to raise a genuine dispute as to whether defendants' stated reasons for her termination are pretextual.

Connelly has offered sufficient evidence to create a genuine dispute as to whether defendants' stated reasons for her termination are pretextual. In particular, Kaegi took credit for terminating "anyone" who received their job purely due to patronage or nepotism on day one of his administration (the same date Connelly was terminated). Moreover, Kaegi initially testified in his deposition that Connelly was a Shakman-exempt employee (who could be terminated for political reasons), yet he testified at another point in the deposition that Connelly's executive

---

[3] *Nelms*, however, does not support summary judgment in defendants' *favor* because it is factually distinguishable. The plaintiff in *Nelms* was not replaced by a new employee whereas Kaegi hired three executive assistants the day Connelly was terminated, at least two of which had less experience as an executive assistant. The fact that Kaegi hired these new executive assistants at the same time he terminated Connelly without offering one of the positions to Connelly could allow a reasonable jury to infer that Connelly was terminated for reasons other than the reorganization.

assistant position was not Shakman-exempt and that Connelly could not be terminated in the same manner she was terminated if she held a non-exempt position. *See, e.g., Gannon v. Daley*, 561 F.Supp. 1377, 1380 (N.D.Ill. 1983) (finding that evidence that defendants justified plaintiff's firing with reference to the *Shakman* decree and a "change in administration" created an issue of fact as to whether plaintiff was fired for political reasons). Furthermore, Connelly was informed that her termination was not due to disciplinary issues, but rather "because of the new administration." Kaegi also hired three executive assistants the day Connelly was terminated, including two who had less experience.

Thus, when viewing the record in the light most favorable to Connelly, a reasonable jury could conclude that the purported restructuring of the CCAO by Kaegi was pretext to terminate Connelly because of her protected speech. The Court notes that the same evidence that plaintiffs use to establish their *prima facie* case will often – as here – suffice to allow a reasonable "jury to determine that a defendant's stated reason for terminating a plaintiff was a mere front for an ulterior, unlawful motive." *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 673 (7th Cir. 2009) (reversing grant of summary judgment where "the district court suffered the misapprehension that a plaintiff necessarily must proffer *different or additional* evidence to [establish] pretext from that she used to establish her prima facie case.") (emphasis in original); *Jackson v. Harvey Park District*, No. 17-cv-2567, 2019 WL 1354398, at *6 (N.D.Ill. Mar. 3, 2019) (same). The jury will need to assess "the persuasiveness of an employer's non-retaliatory explanation" for Connelly's termination. *Massey*, 457 F.3d at 719

In sum: neither side is entitled to summary judgment on plaintiff's retaliation claim because the record contains evidence cutting in both directions on the questions of whether

defendants knew of Connelly's political support and association in favor of Berrios, and defendants' motivation for terminating Connelly.

    **B. Summary Judgment on Connelly's *Monell* Claim is Precluded Due to the Presence of a Genuine Dispute of Fact as to Whether Connelly Suffered A Constitutional Injury that was Caused by Kaegi.**

Next, both sides each seek summary judgment on Connelly's *Monell* claim against the CCAO. A municipality may be liable for a section 1983 violation only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). We interpret that language as creating three bases for municipal liability: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Id.* (citing *Estate of Sims ex rel. Sims v. Cty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007)). Connelly is proceeding under the third basis. (Dckt. #114 at 13). "It is well-established that when a particular course of action is directed by those who set municipal policy, the municipality is responsible under section 1983, even if the action in question is undertaken only once." *Valentino*, 575 F.3d at 675.

Connelly first has the burden of showing that Kaegi was a person with final policymaking authority for the CCAO. "Whether a particular official has final policymaking authority is a question of state law, . . . including positive state law and customs and practices having the force of [state] law," and this matter is to be decided by the court. *Wragg v. Vill. of Thornton*, 604 F.3d 464, 468 (7th Cir. 2010) (cleaned up); *Valentino*, 575 F.3d at 675; *Kujawski v. Bd. of*

13

*Comm'rs of Bartholomew Cnty.*, 183 F.3d 734, 737 (7th Cir. 1999) ("Final policymaking authority may be granted directly by statute or delegated or ratified by an official having policymaking authority."). "A person has final policymaking authority for employment purposes if he has 'authority to set policy for hiring and firing.'" *Connelly v. Cook Cnty. Assessor's Off.*, 583 F.Supp.3d 1142, 1148 (N.D.Ill. 2022), *quoting Kujawski*, 183 F.3d at 739.

Cook County is not the municipality that is responsible for employee decisions within the CCAO; rather, it is the CCAO and the Cook County Assessor themselves. *See Connelly v. Cook Cnty. Illinois*, No. 19-cv-07894, 2021 WL 1088274, at *3 (N.D.Ill. Mar. 22, 2021). More specifically, Illinois law vests Kaegi (as the county assessor in a county with a population of 3,000,000 or more) with the authority to appoint a chief deputy assessor and deputy assessors in charge of the administrative service and real estate divisions, and to "employ other clerical help and deputies as may be necessary" who shall be appointed by the assessor under the civil service law applicable in Cook County. 35 ILCS 200/3-55. As such, Kaegi, as the Cook County Assessor, "has 'plenary power to hire or fire the employees required for operation of the assessor's office'" under state law. *Roth v. Yingling*, No. 10-cv-64, 2010 WL 2732304, at *4 (N.D.Ill. July 8, 2010), *quoting Harris v. Eckersall*, 771 N.E.2d 1072, 1073 (Ill.App.Ct. 2002). Moreover, as Cook County Assessor, Kaegi has the authority to exercise this power "for any purpose which [he] may determine is for the most economical and efficient administration of the affairs of his office." *People ex rel. Austin v. Bd. of Comm'rs of Cook Cnty.*, 43 N.E.2d 591, 593 (Ill.App.Ct. 1942). Accordingly, the Court finds that Kaegi has final policymaking authority for purposes of determining which CCAO employees to fire (or hire, in the first instance). *See, e.g., Roth*, 2010 WL 2732304, at *4; *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 469 (7th Cir.) ("cases limit municipal liability under section 1983 to situations in which the

official who commits the alleged violation of the plaintiff's rights has authority that is final in the special sense that there is no higher authority.") (citations omitted).[4]

Summary judgment for either side, however, must be denied because there is a genuine dispute of fact as to whether Connelly suffered a constitutional injury (namely, being fired in retaliation for her political speech and association with Berrios) that was caused by Kaegi. *Supra*, at Section III(A).

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgement, (Dckt. #112), and defendants' motion for summary judgment, (Dckt. #109), are both denied.

**Date: October 28, 2024**

**Jeffrey I. Cummings**
**United States District Court Judge**

---

[4] The Court notes that the fact that an official is a decisionmaker with respect to hiring and firing decisions for a municipality does not necessarily mean that that official is the final policymaker with respect to those decisions. *See, e.g., Valentino*, 575 F.3d at 675.